# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                      Case No. 05-CR-130

CARSON J. JONES,

    Defendant.

## RECOMMENDATION TO CHIEF UNITED STATES DISTRICT JUDGE RUDOLPH T. RANDA

On May 10, 2005, a federal grand jury in this district returned a three-count indictment against defendant Carson J. Jones. The indictment charges the defendant in Count One with being a felon in possession of ammunition which has been transported in interstate commerce in violation of Title 18, United States Code, §§ 922(g)(1) and 924(a)(2). Count Two charges the defendant with being a felon in possession of a firearm which was transported in interstate commerce in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count Three charges the defendant with possession with intent to distribute cocaine base in the form of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

On May 27, 2005, the defendant appeared for arraignment and plea, entering a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant filed a motion to suppress physical evidence and statements. (Docket #10). The motion is fully briefed and will be addressed herein.

## MOTION TO SUPPRESS

The defendant moves the court, pursuant to the Fourth Amendment, to suppress all items seized from 6951 North 60th Street, Apartment #105, Milwaukee, Wisconsin, by Milwaukee Police Department (MPD) officers on December 17, 2004, and on April 12, 2005. The defendant asserts that suppression is warranted because the residence was entered and searched on both days without a warrant, consent or exigent circumstances. In addition, the defendant seeks suppression of his custodial statements because they were fruits of the illegal search and arrest in violation of his Fourth Amendment rights.

The court conducted an evidentiary hearing on the defendant's motion on June 29, 2005. The following individuals testified on behalf of the government at the hearing: MPD Officers Thomas Balistreri and Thomas Multhauf, MPD Sergeant Rick Burmeister, and MPD Detective Victor Wong. Shoa Harris testified on behalf of the defendant. Based on the testimony and evidence presented at the hearing, the court makes the following findings of fact and recommendation for the proposed disposition of the defendant's motion to suppress.

## FINDINGS OF FACT

On December 17, 2004, MPD Officer Thomas Balistreri was working the day shift when he received a call from his dispatcher advising him to check out a recklessly endangering safety complaint at 6951 North 60th Street, Apartment #105, Milwaukee, Wisconsin. Officer Balistreri, who was in a one-man squad car, received the dispatch at 11:09 p.m. and went to the N. 60th Street address. Officer Balistreri was aware of previous reports of drug dealing at the 12-unit apartment building at 6951 North 60th Street.

When he arrived at the apartment building, Officer Balistreri went to the door to the common hallway, but it was locked. He rang the doorbell for apartment #105, but it did not

work. He then knocked on the door for seven to ten minutes, but no one answered the door. Officer Balistreri contacted his dispatcher and advised that he could not get into the apartment building. He then went back on patrol and made a traffic stop.

A short while later, Officer Balistreri received another call from the dispatcher who told him that the person who had initially called in the complaint had called back. The individual said that he would meet the officer at the rear of the apartment building.

Officer Balistreri went back to 6951 North 60th Street and met Kendrick O'Hara, who had called in the initial complaint, at the rear of the building. Mr. O'Hara advised Officer Balistreri that at about 11:00 a.m., he heard gunshots in the building. Shortly thereafter, the tenant in apartment #105, who had moved into the building about two weeks earlier, knocked on Mr. O'Hara's door. He was holding a gun and told Mr. O'Hara to come out of his apartment. The person, who was subsequently identified as the defendant, said two men had come to his apartment and had tried to kill him. The defendant accused Mr. O'Hara of having something to do with what happened. Mr. O'Hara refused to open the door. The defendant then went downstairs and left the apartment building with another individual. They left in two separate cars.

A short time later, the defendant then came back, again knocked on Mr. O'Hara's door, but said that he did not have a gun. Mr. O'Hara was able to see the defendant through the security opening in his door.

After speaking to Mr. O'Hara, Officer Balistreri went into the apartment building and observed four bullet holes in the door to apartment #105. Four .25 caliber casings were found in the hallway near the door. The bullet holes in the door were centered in a cluster about the height of the chest/sternum area of a 5'10" person.

Officer Balistreri pounded on the door to apartment #105 and said, "Milwaukee Police Department, is anyone there, is anyone hurt?" There was no answer from the apartment. Officer Balistreri did not know if someone was shot and injured inside the apartment, but was concerned based on the four bullet holes in the door.

Officer Balistreri spoke again to Mr. O'Hara and asked who owned the apartment building, who the manager was, and who lived in apartment #105. Mr. O'Hara said that one man lived in apartment #105, but that his girlfriend was frequently at the apartment. Officer Balistreri called for his supervisor, Sergeant Rick Burmeister. In situations like this, it is MPD policy to call a supervisor to the scene. Officer Balistreri had safety concerns so he also called for an additional squad car.

Sergeant Burmeister received a call from the dispatcher at 12:38 p.m. and went to the apartment. He arrived at the scene about five minutes after he was called. Officer Hayes also arrived to assist Officer Balistreri. Officer Balistreri told Sergeant Burmeister what he had observed and what he had been told.

Linda Siddell, the apartment manager, was called and came to the building. Sergeant Burmeister explained to her that the officers wanted to get inside the apartment to see if anyone was inside. He was concerned that someone might be injured inside the apartment. He made the decision to enter the apartment based on the facts that people had heard gunshots, that there were four bullet holes in the door, and that four shell casings were found on the floor. Ms. Siddell gave the key to apartment #105 to Sergeant Burmeister. She authorized the police to use the key to enter the apartment.

When they entered the apartment, the officers announced who they were. Officer Balistreri searched the apartment while Sergeant Burmeister stayed in the living room area.

The officers looked for signs of bullets inside the door. The apartment, which was sparsely furnished, had two bedrooms, a kitchenette, living room, hallway, and bath. There was an entertainment center in the living room. Throughout the search, the officers kept repeating, "Milwaukee Police Department search, is anyone hurt?" Officer Balistreri had his weapon drawn as he went into each room and he checked any place where a victim may be hiding.

In the kitchen area, Officer Balistreri observed a garbage can full of baggies and a white fast food bag near the telephone which was filled with empty sandwich bags. A container for baggies was also visible. The double doors to a sliding closet in the front hall area were open and Officer Balistreri observed ammunition on the shelf. In the first bedroom on his left, he observed a box of shotgun shells and a rifle magazine. He also saw two boxes of shotgun shells under the bed in the master bedroom.

Officer Balistreri only opened one closet door. Inside the closet he observed several different brands of 12-gauge shotgun shells on the shelf. Officer Balistreri went back to Sergeant Burmeister and told him what he had seen, including the shotgun shells from a .25-caliber weapon.

Sergeant Burmeister called the Crime Investigation Bureau (CIB) to come to the scene. The apartment was secured so that evidence did not get tampered with or destroyed. Shortly thereafter, MPD Detective Victor Wong from CIB came to the apartment. Officer Balistreri told Detective Wong what he had observed. Officer Wong's job was to investigate the complaint of endangering safety by dangerous use of a weapon.

After the search, the manager obtained the name of the person who rented the apartment and his cell phone number. Sergeant Burmeister called the defendant and asked him to come home. When the defendant arrived, he identified himself. Sergeant

Burmeister asked him why he had left when the apartment was shot up and why he did not come to the police department to report the incident.

Detective Wong and the defendant sat at the kitchen table in the defendant's apartment. The defendant, who was not under arrest, agreed to speak with Detective Wong. The defendant told Detective Wong that he and Latanya Nicholson were sleeping at about 8:00 a.m. or 9:00 a.m. when the defendant's uncle called and said he wanted to see the apartment. The defendant's uncle came and toured the apartment and then left. The defendant went back to the bedroom and heard a knock on the door. He went to the door and opened it. A black male outside the door asked about the person living upstairs. The defendant saw a second black male with a gun so he shut the door and ran back to the bedroom. He said he did not know these men. The defendant then heard gunshots and he and Ms. Nicholson left the apartment. He did not give Detective Wong a reason why he did not call the police.

Detective Wong asked the defendant if he had ever been arrested and the defendant said that he had been arrested for robbery and did two and a half years at Oshkosh Correctional Institution. Detective Wong said that the officers had found ammunition for a 12-gauge shotgun in the bedroom. The defendant explained that his father, who had died in 2003, had owned guns and that his mother had packed up the ammunition for those guns and given it to the defendant. The defendant said there was other ammunition in the front hall closet. He said that he had no guns. Detective Wong called his department and was told that possession of ammunition by a convicted felon violates federal statutes, but it is not a state offense.

Detective Wong went to apartment #205 and spoke to Mr. O'Hara. He brought Mr. O'Hara downstairs to identify the defendant. He also spoke to Mr. Ford who lived in

- 6 -
Case 2:05-cr-00130-RTR    Filed 08/09/05    Page 6 of 18    Document 15

apartment #106. Mr. Ford said that he saw someone come out of apartment #105 with a shotgun. Mr. Ford identified the defendant as the person with the shotgun and said that he went upstairs with the gun.

Detective Wong went through apartment #105 because there were bullet holes in the door and he was checking for bullet impact marks. He did this after he talked to the defendant, but before he placed him under arrest. The defendant was then placed under arrest. No guns were found in the apartment, only ammunition.

Officer Thomas Multhauf was working the 4:00 p.m. to midnight shift on April 12, 2005. At about 4:30 p.m. on that date, he and his partner went to look for the defendant at his residence at 6951 North 60th Street, Apartment #105, because the defendant had eight outstanding warrants for various misdemeanor and municipal court violations, including operating after revocation, disorderly conduct, vandalism, and contempt of court. Officer Multhauf knew the defendant from a prior drug arrest and he had also conducted a traffic stop on the defendant. This was the first time he had been at the defendant's residence.

Officer Multhauf and his partner, Officer Carrie Pocernich, went to the apartment building and a tenant who was leaving the building let the officers inside. The officers heard loud music coming from the defendant's apartment. Officer Multhauf went to the door of apartment #105 and identified himself as a Milwaukee police officer, saying that the officers had received a loud music complaint. At this point, Officer Pocernich was at the back of the residence to make sure no one left through a window. No complaints of loud music had been received.

The parties dispute what occurred after Officer Multhauf arrived at the apartment door. According to Officer Multhauf, he knocked on the door and someone inside asked

him to wait a minute.  Shoa Harris, the defendant's friend, eventually opened the door. Officer Multhauf identified himself and said he was investigating a loud music complaint. He asked if he could come in and Ms. Harris gave him permission to enter the apartment. Officer Multhauf said that while he was in the front doorway talking to Ms. Harris, he smelled freshly-burned marijuana and saw smoke and a burning marijuana cigarette on a table.

Ms. Harris said that she and the defendant were watching TV in the living room when the police rang the doorbell about 4:00 p.m.  She went to the door, but was unable to see anyone because she said the person had his finger over the peephole.  She asked who was there and Officer Multhauf responded, "police."  She opened the door and saw a police officer in uniform.  Ms. Harris testified that the officer said that the police had been called because of the loud music.  She told him that the music had been on for less than two minutes.  She had been in the apartment for about 45 minutes before the police arrived.

Ms. Harris denied that she gave the officer permission to enter or to search the apartment.  Rather, she testified that the door was about half open and she was standing in the doorway when the officer started to walk into the apartment.  He made some physical contact with her, but did not physically push her.  Ms. Harris told the officer that she did not give him permission to enter the apartment.

Officer Multhauf testified that when he entered the apartment, he saw the defendant come out of the bedroom and walk towards a closet in the hallway and then go back towards the bedroom.  The defendant said he remembered the officer and knew Officer Multhauf's name. Officer Multhauf knew the defendant and was aware that the defendant had run from the police on a prior occasion.  The defendant wanted to be arrested outside,

but Officer Multhauf, who was concerned that the defendant might try to flee, handcuffed him inside the apartment.

When the handcuffs were placed on the defendant, he started to tense up so Officer Multhauf called for his partner and for another squad to assist him. Someone let his partner into the apartment building. The officers in the other squad rang the doorbell and were able to get into the apartment.

Officer Multhauf checked the rest of the residence to see if anyone was present who could pose a danger to the officers. He observed a 12-gauge shotgun in an open closet in the bedroom that the defendant had been in. The weapon was a pump action, single barrel shotgun. He also saw five shotgun shells. In the hallway closet, Officer Multhauf saw a scale and a baggie with what he believed to be crack cocaine. On top of the dresser in the bedroom, Officer Multhauf observed an X-Box game on top of which he saw what appeared to be cocaine residue and a razor blade.

In the living room, there was a burning marijuana cigarette on the coffee table. Another table on the right side of the hallway had leaves of marijuana on top of it. He also saw plastic baggies with corner cuts. Officer Multhauf heard no noises coming from other parts of the apartment. The defendant's partner put out the marijuana cigarette. The photo car was called to take photographs of the items observed in the defendant's apartment.

Ms. Harris testified that she is a friend of the defendant and has known him since December, 2004. She came to the defendant's apartment on April 12, 2005, and had been at the defendant's home a few times before. She never used drugs with the defendant or saw the defendant use drugs.

She further testified that the defendant came out of the bedroom and the officer told him that he had warrants for the defendant's arrest. He told the defendant to put his hands behind his back and the defendant started to comply. Another officer then entered the apartment and stated that no one had come out of the building.

The defendant told Ms. Harris to call his mother. According to Ms. Harris, the male police office said she was under arrest and told the female officer to handcuff Ms. Harris which she did. Other officers then came to the apartment. The defendant was taken out of the apartment. Detectives came to the apartment and told the officers to unhandcuff Ms. Harris and to let her go. She denied saying that she and the defendant were not smoking marijuana. She also denied that there was a marijuana cigarette burning on the table.

Ms. Harris was shown Exhibits #1 through #7 which were photographs taken at the defendant's apartment on April 12, 2005. With respect to Exhibit #1, she said that she was not in that room and was only in the front room and bathroom. She denied ever seeing the shotgun or going into the closets in the apartment. She did not know what the items were on the table in Exhibit #7. She did not see the items in Exhibit #4 on April 12, 2005.

Officer Multhauf testified in rebuttal that he had a conversation with Ms. Harris through the apartment door after he knocked on the door. She asked him to wait a minute. After a few minutes, the door opened and Ms. Harris told him that she was in the back bedroom and did not have her shirt on and needed to get dressed. This information is not reported in Officer Multhauf's report. Officer Multhauf stated that the marijuana cigarette was on the table and the same leafy substance was on both tables shown in Exhibits #4 and #7.

## ANALYSIS

The defendant seeks an order, pursuant to the Fourth Amendment, excluding from evidence all items seized from 6951 North 60th Street, apartment 105, on December 17, 2004, and on April 12, 2005. He seeks suppression because he asserts that his residence was entered and searched on both dates without a warrant, consent or exigent circumstances. In addition, the defendant seeks suppression of his custodial statements because they are the fruits of the illegal search and arrest. The government opposes the defendant's motion.

Warrantless searches are presumptively unreasonable under the Fourth Amendment, and are "subject only to a few specifically established and well delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Mincey v. Arizona, 437 U.S. 385, 390 (1978); United States v. Robles, 37 F.3d 1260, 1263 (7th Cir. 1994). One exception to this general rule permits law enforcement officers to enter a dwelling without a warrant if there are exigent circumstances. Another exception is if the officers obtain voluntary consent either from the individual whose property is to be searched or from a third party possessing common authority or joint control over the premises. United States v. Grap, 403 F.3d 439, 443 (7th Cir. 2005); United States v. Saadeh, 61 F.3d 510, 517 (7th Cir. 1995); see also, Florida v. Jimeno, 500 U.S. 248 (1991); Illinois v. Rodriguez, 497 U.S. 177, 186 (1990).

With respect to the first exception, the "Supreme Court has consistently held that a warrant must be obtained prior to searching a person's residence, unless 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" United States v. James, 40 F.3d 850, 862 (7th Cir. 1994) (quoting Mincey v. Arizona, 437 U.S. 385, 394 [1978]),

vacated on other grounds, 516 U.S. 1022, 116 S. Ct. 664 (1995).  Exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant. United States v. Jenkins, 329 F.3d 579, 581 (7th Cir. 2003); United States v. Saadeh, 61 F.3d 510, 516 (7th Cir. 1995), (citing Michigan v. Tyler, 436 U.S. 499, 509 [1978]).

One such circumstance is present when the police "reasonably fear[] for the safety of someone inside the premises." Jenkins, 329 F.3d at 581 (quoting United States v. Richardson, 208 F.3d 626, 629 (7th Cir. 2000). As the court explained in Jenkins: "The safety of others is a particular concern when police respond to a report of a crime in progress, and, in such a situation, police judgments regarding warrantless entries "should be afforded an extra degree of deference."  329 F. 3d at 581 (quoting Reardon v. Wroan, 811 F.2d 1025, 1029 (7th Cir. 1987).

The existence of exigent circumstances is analyzed from the perspective of the law enforcement officers at the scene. Saadeh, 61 F.3d at 516.  The question is not what the officers could have done but rather whether, at the time, they had a reasonable belief that there was a compelling need to act and no time to obtain a warrant.  Id. The government bears the burden of proving that its agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry.  See United States v. Robles, 37 F.3d 1260, 1263 (7th Cir.1994).

It is also well-established that a warrantless entry into a residence to effect an arrest is presumptively unreasonable under the Fourth Amendment.  Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Saadeh, 61 F.3d 510, 516 (7th Cir. 1995). However, if a person with authority to do so consents to the entry, the entry is reasonable and the Fourth Amendment is not violated.  United States v. Walls, 225 F.3d 858, 862 (7th Cir. 2000) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Regarding the

issue of consent, the standard for measuring the scope of an individual's consent under the Fourth Amendment "is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" See Florida v. Jimeno, 500 U.S. 248, 251(1991); Illinois v. Rodriguez, 497 U.S. 177 (1990). The government bears the burden of proof by a preponderance of the evidence that the consent was given freely and voluntarily. United States v. Grap, 403 F.3d 439, 443 (7th Cir. 2005)..

With respect to the search of the defendant's apartment on December 17, 2004, Officer Balistreri went to the residence in response to a citizen complaint. Although Officer Balistreri initially was unable to obtain access to the apartment building, he subsequently was sent back to the building to meet with the complaining citizen. Officer Balistreri met with Kendrick O'Hara who advised him that he had heard gunshots in the building about 11:00 a.m., and that thereafter the man who lived in apartment #105 knocked on his door. Mr. O'Hara advised the officer that the man was holding a gun and told Mr. O'Hara to come out of his apartment. The man, who was later identified as the defendant, told Mr. O'Hara that two men had come to his apartment and tried to kill him and that he believed Mr. O'Hara was somehow involved. Not surprisingly, Mr. O'Hara refused to open the door. Mr. O'Hara saw the defendant leave the building and a short time later, he returned to Mr. O'Hara's apartment, knocked on the door and said he no longer had the gun.

Officer Balistreri entered the apartment building after speaking with Mr. O'Hara in the parking lot. He observed four bullet holes in the door to apartment #105 and four .25 caliber casings in the hallway near the door. Officer Balistreri pounded on the door to apartment #105, announcing "Milwaukee Police Department, is anyone hurt?" He was concerned that someone might be shot and injured inside the apartment. This concern

was reasonable since Officer Balistreri was aware that gunshots had been heard by tenants in the building, four bullet holes were in the door to apartment #105 and shell casings were found on the hallway floor.

After Officer Multhauf's supervisor and the apartment manager arrived, the apartment manager gave the apartment key to the officers to enter the apartment. When they entered the apartment, Officer Balistreri and Sergeant Burmeister announced their presence and Office Balistreri checked all the rooms and any places where a victim could be hiding.

Given the shots heard, the bullet holes in the door and the shell casings, Officer Balistreri and Sergeant Burmeister had a reasonable fear that someone may be injured inside the apartment. They, therefore, had a compelling need to act promptly and did not have time to obtain a warrant on December 17, 2004, before entering the defendant's apartment. Thus, the officers' entry and search of the defendant's apartment, based on exigent circumstances, did not violate the Fourth Amendment. See Jenkins, 329 F.3d at 581; Saadeh, 61 F.3d at 516. Accordingly, this court will recommend that the defendant's motion to suppress the search on December 17, 2004, be denied.

On April 12, 2005, MPD officers again searched the defendant's apartment. The parties dispute whether Officer Thomas Multhauf was given consent to enter the apartment that day. Officer Multhauf testified that he went to look for the defendant at his residence because the defendant had eight outstanding warrants. When he arrived at the door to the apartment, he identified himself as a Milwaukee police officer who was responding to a loud music complaint. Someone inside asked him to wait a minute, and after a few minutes, Ms. Harris opened the door and told him that she had been in the back bedroom. Ms. Harris told the officer that she had not had her shirt on and needed to get dressed.

According to Officer Multhauf, he asked Ms. Harris if he could come in and she said yes. Officer Multhauf testified that while he was in the front doorway talking to Ms. Harris, he smelled marijuana, saw smoke and also saw a burning marijuana cigarette on a table in the living room.

According to Ms. Harris, she and the defendant were watching TV in the living room when the doorbell rang. She went to the door, but was unable to see who was ringing the doorbell because the peep hole was covered. When she opened the door, she saw the police officer. Ms. Harris denied giving Officer Multhauf permission to enter or to search the apartment. She also testified that the officer entered the apartment and at that time, the defendant came out of the bathroom and was advised that the officer had warrants for the defendant's arrest. Ms. Harris testified that she never used drugs with the defendant or saw the defendant use drugs. When shown a photograph of the marijuana cigarette and lighter which Office Multhauf testified were on a table in the living room (Exh. 7), Ms. Harris testified that she did not know what the items were.

The testimony of Officer Multhauf and Ms. Harris is diametrically opposed with respect to the issue of consent. After careful consideration, the court determines that the testimony of Officer Multhauf is more credible. Officer Multhauf's testimony was clear and straightforward. He testified that he knocked on the apartment door and someone inside told him to wait a minute. When Ms. Harris opened the door, he smelled marijuana and saw a marijuana cigarette burning on a table inside the apartment. Officer Multhauf testified that Exhibit 7 is a photograph taken at the defendant's apartment on April 12, 2005. The photograph shows the cigarette, which tested positive for marijuana, on the table.

Ms. Harris denied that she and the defendant were smoking marijuana and denied that there was a burning marijuana cigarette on the table. Although she had seen marijuana two or three times, Ms. Harris testified that she did not know what the items depicted in Exhibit 7 were. The record is devoid of any evidence that the photographs admitted into evidence were taken at another location or at another time. Ms. Harris also testified that the defendant was in the living room when they heard someone at the door. She later testified that the defendant was coming out of the bathroom when the officer entered the apartment.

Officer Multhauf testified that the defendant recognized him when he entered the apartment. This testimony was corroborated by the testimony of Ms. Harris. Despite the physical evidence and photographs taken at the apartment, Ms. Harris denied that she and the defendant used drugs or were smoking marijuana that afternoon. All of these circumstances lead this court to conclude that Officer Multhauf's testimony is more credible and that Ms. Harris gave him consent to enter the apartment.

It is also well-established that as an incident to an arrest, police officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack can be launched." Maryland v. Buie, 494 U.S. 325, 337 (1990). Beyond that, however, officers conducting a protective sweep of an arrestee's home following an in-house arrest, must have "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id.

In this case, Officer Multhauf testified that after the defendant was placed in handcuffs, he conducted a protective sweep of the apartment because he was concerned for the safety of the officers. Officer Multhauf saw the shotgun in the open closet in the

bedroom. This was the same bedroom which Officer Multhauf had seen the defendant come out of when he entered the apartment. Although not entirely clear, it appears that the defendant was in the hallway immediately outside the bedroom when he was taken into custody. Officer Multhauf also saw what he believed, based on his experience, to be cocaine residue on top of the dresser in that bedroom. These items were in plain view when observed by Officer Multhauf. Similarly, the marijuana cigarette and residue were in plain view when Officer Multhauf entered the apartment. In addition, Officer Multhauf saw a scale and a baggie of crack in the open hallway closet.

Officer Multhauf also conducted a protective sweep of the entire apartment for the safety of the officers. While concern for officer safety is a paramount consideration, no specific and articulable facts were presented at the hearing to establish a reasonable belief that someone else was in the other rooms who posed a danger to the officers as required. See Buie, 494 U.S. at 337. Regardless, none of the evidence obtained from the defendant's apartment is subject to suppression. "The exclusionary rule does not apply to evidence that is sure to be located through lawful means." United States v. Blackwell, ___ F.3d ___, 2005 U. S. App. LEXIS 15241, *4 (7th Cir., July 26, 2005). As the court explained: "[s]uppression of such evidence would be a windfall for the accused." Id.

Here, Officer Multhauf observed that the apartment contained contraband. Given this knowledge, the officers could have obtained a search warrant and the various items of evidence seized from the apartment would have been found. See Id. at *5. Thus, any evidence seized need not be suppressed. Id.

Accordingly, the court will recommend that the defendant's motion to suppress evidence seized from his residence on April 12, 2005, be denied. In light of the foregoing,

- 17 -
Case 2:05-cr-00130-RTR   Filed 08/09/05   Page 17 of 18   Document 15

the court also recommends that the defendant's motion to suppress his custodial statements also be denied.

## **CONCLUSION**

**NOW, THEREFORE, IT IS RECOMMENDED** that Chief United States District Judge Rudolph T. Randa enter an order denying the defendant's motion to suppress physical evidence and statements. (Docket # 10).

Dated at Milwaukee, Wisconsin, this 9th day of August, 2005.

BY THE COURT:

s/Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge